Your Honor, this case on the Dock 2-18-0439, Wilmington Savings Fund Society, F.S. 2, being in business as Christian Mountain Trust, as president for Norman Morgan's loan trustee, Mr. Attalee, the Anatoly Guzman at Attalee. Currently on behalf of Mr. Kevin Peltz, Mr. Thomas N. Adams, and the Anatoly Guzman at Attalee, Mr. Adam A. Peltz. Mr. Parris. Good morning. Good morning. May it please the Court, Tom Parris on behalf of Appellants Nemoff and Beckerman. Please keep your voice up so the recorder can accurately hear you. Thank you for the reminder. I will. The issue that brings us before the Court is equitable, I'm sorry, conventional subrogation and the various elements and how they apply to this case. It's my position that they should not apply to this case, though I'm not arguing that this concept should be thrown out. Are you saying that none of the elements apply? I'm sorry? Are you saying that none of the elements apply here? I don't think they do. I mean, obviously the agreement aspect of it I think is most important and the one that is most highly litigated, but I wouldn't like to go through all four of them unless you want to focus me on one in particular. No, whatever you think is your strongest argument, because, I mean, obviously the case law requires a consideration of all the elements. I think it does, and I think that the appellee, the burden of proof is on them to show each one of those elements by a preponderance. Otherwise, I think the conveyance act should, as it does in whatever, 99.9% of the rest of mortgages in the world take precedence. But conventional subrogation is an equitable right springing from an express agreement, and we read that the substance of the transaction and equity will effectuate the intention. And so what were the intentions of the parties at this closing? Unlike most of the cases that I have read, that you have read, we do have real testimony here from Mr. Zarkin. Mr. Zarkin's testimony is in the record, and on page 9 and 10 of my brief, I put what I think is the most important part of his testimony, and significantly, he directly was asked, and it was your intention to pay off that mortgage, that being the Beckerman Nemoth mortgage, as part of this transaction. He says, correct, and we know that there was enough money to do so. Was that his intention, or was it the bank's intention? Well, he said it's his intention. I'm quoting from his testimony. Now, but that's an excellent point in terms of what are the intentions of paragraph 4 of pretty much the uniform mortgages. It's, I guess, that they get a first-place position and everybody is paid off. Everyone is my client. That $150,000 was as important as any other money that should have been paid off because it's clearly one of the three mortgages on top of those two mortgages that were placed on that debt. But I interject a question, which was, didn't he also say that I was going to pay off your client, but I spent the money on my business instead? He did. And so what is the intention? At the time, I mean, if this is a contract or equity situation, aren't we looking at when he goes to the closing table or when he signs these documents or when he's applying for these mortgages, is that the point of the intention? I think it is. I mean, a lot of people enter into a contract and then for whatever reason, circumstances don't work out and they want to change the deal, which is apparently what Mr. Zarkin did here. I mean, why the closures? Why would the plaintiffs be at fault if Zarkin is the one who made the decision? What's that got to do with them? They had an agreement. You argued that there has to be an express agreement, but the case law does not say that. The case law says it has the effect of an agreement. That's what Ames Capital said. That's what this court said in Ames Capital, correct? It did, yes. So why are the plaintiffs at fault for something that Mr. Zarkin did on his own? I don't know that it's so much a fault because they didn't necessarily bring it upon themselves by something that they did, but they're asking this court to step in with equity and fix the problem that Mr. Zarkin created. But if we look at, again, intentions, whether written or spoken or somehow divided from his actions, what point are we looking at the intentions? The lens that we look to, whose intention is the controlling issue here? I think you'd have to concede certainly Bank United thought that they were going to assume the priority of the other two lenders. I don't think anybody disputes that. You're saying that it went awry because Mr. Zarkin didn't pay off what he said he was going to do. But when they left the closing table, the intention was everybody got paid off and their liens would have priority, correct? That was, I believe, the intention. So did the agreement say anything that the whole thing, the whole security priority, was contingent on Zarkin being paid? I didn't see that anywhere in here. You mean Mirov-Beckerman getting paid? Well, I think it says the loans above, and my client has a loan above at that point. There's three loans above. So why would the other two loans have any greater importance than my client's loan in a conventional subrogation? They're all up there, and they all need to be taken out where, that is, Bank United and the plaintiffs step up into one or more of those spots. I mean that's what they're asking for is that the substance of what was supposed to happen here was that we became the first priority. And do we want, I've posited in my brief that this no longer becomes an exception. It becomes the rule because Paragraph 4, every case seems to have Paragraph 4. These two loans have Paragraph 4 in it. So we don't need the Conveyance Act anymore because if that's what we're going to simply use as Paragraph 4 because the concept of conventional subrogation takes over because it's always there. So what would be the remedy to this situation? You've acknowledged that Bank United went into this with the assumption that when they made the payments they would step into the shoes of the other lenders, correct? Of all of the other lenders. And your client would remain in the same position if they had been paid by Mr. Zarkin, right? Well... So do we do contingency subrogations? Is that what we do? Is that what the lenders are going to do here? This transaction is more difficult because of how it's spread out over two loans and the loans above it. At the time of this transaction, the two mortgages above my client's are $672,000 and $610,000. So $1,282,000. The plaintiff's mortgage is only $1,053,000. So they can't even cover the most senior of the mortgages. They need Countrywide to come along. And that's, I'll just say the odd part of the reconsidered motion, or the reconsideration, is that Judge Hoffman re-looks at this Countrywide mortgage. And Countrywide has never participated in this transaction, or this litigation. So all we have is their paragraph 4 as well, frankly. But if, I mean, why do we give... Do we even know if there's a paragraph 4 if they weren't participating? Yes, I have that as part of the appendix, Exhibit G. I specifically took both of the pages that have uniform paragraphs 4. And you got this through discovery from whom? Well, it's part of the record. It's part of the trial exhibits that were embedded into evidence. It's limited, you know, on mortgages. I'm curious as to how your client was injured or damaged any greater than they would have been if the prior mortgages had been foreclosed. So, again, looking at this case, there's perhaps 400,000 of Countrywide that maybe my client doesn't have to worry about. But I think one of the harms that I see is an inability to control this litigation. I mean, there's $150,000 mortgage. If I'm first, it's a whole different ballgame because, frankly... Why are you first? Because I'm first in time... Because the prior mortgages were bought and paid for by the mortgage in question? Well, they weren't. There's only a million. They don't have enough to even... By the mortgages in question? By the mortgages in question, yes. And, of course, my client, too. There was enough money and it should have been paid off. But the harm, and that is a difficult proposition under this conventional subrogation, but there is harm when you don't... You have to ride shotgun to another litigant's choices and how it's what they're going to do and whether or not you can... Do you have a case that stands for that proposition? I don't. Okay. I don't. Speaking of the cases that stand for proposition, you knew, of course, when you wrote your brief, that you cannot cite Rule 23 opinions, correct? Rule 23 orders. I did know that, and I don't... You didn't acknowledge it in your reply brief. I'm sorry? You did not acknowledge that. I put a footnote that, frankly, I've seen in other matters, and as I've reflected on it over the time, I can't say that... I'm not going to try to defend my action and I'm not going to rely on PBEI, and so I'll simply offer an apology because, yes, I know about unpublished decisions. I've seen footnotes from various people. Since then, I've seen lots of discussion in the law world and other places about... Well, you must know that the Supreme Court recently and resoundingly rejected the argument that attorneys should be allowed to cite Rule 23 orders. I do, and I'm not going to argue that aspect of the case, and I'll offer an apology to the extent that it seemed in any way underhanded. I simply... I think it's... I'm not going to talk about the case, but I've seen it done. I've seen it discussed, and so I did it, and that's all. I'm not... And I'll just offer that. Go ahead. Let's get back to the issue that Justice McClaren raised of harm to your client. At the end of the day, if this transaction never took place, your client would still be subordinate to other mortgages, correct? So how, at the end of the day, did he end up in a... than they would have been if the transaction didn't take place? It's history that we don't know, actually. It's history that if you really wanted to look at it, you'd say, what in the heck happened to Countrywide, and could my client have bettered their position because Countrywide apparently, as we know historically, is on the rocks, and maybe my client buys out their position so it can have more control. Well, that's exactly what you just said. That's speculation, right? It is. And doesn't... Isn't it a fact that your client's mortgage states that it's a junior mortgage subordinate to the July 21, 2006 mortgage? It does. And so they knew they were subordinate to at least one mortgage, and... And they remained subordinate. Yes. They ended up in the same position they were before the transaction, correct? In terms of being subordinate, at least, to earlier mortgages, right? Yes. Yes, because under the first in time, first in right, they were in third position. And so I've never tried to argue otherwise. But in looking at that somewhat amorphous concept of harm, I'm trying to frankly look at realities of not being able to control the litigation of nearly ten years' worth of litigation at enormous expense, over $150,000 when there's, you know, a million dollars. And I think that... I don't have a case, but I think the practicalities of litigation are and have been different. I would... In terms of this, before I leave the whole intention of the parties, what would Zarkin have had to say differently to make this different? He says, I intended to pay this off. There was money to do it. But somehow he gets away from the closing table with the money instead of it being paid to my clients. I mean, I don't know... Well, do your clients have a remedy against Zarkin? He filed bankruptcy, so no, they don't. Incidentally, Mr. Zarkin has died during the course of this litigation, so we'll never know anything more than his testimony that he's already given. But most of the cases, maybe all the cases that I've looked at, at best there's an affidavit. The plaintiff never brought forward a witness because, frankly, the plaintiff is several different entities over time, so there's nobody that can speak on their behalf. My clients weren't at the closing. They weren't notified at the closing. This was obviously a mess that developed. But if we're looking at intentions, which I think we're supposed to do in terms of the substance of the transaction and equity will try to effectuate what the parties did, that's the intention. That's the intention. I don't know what he would have to say any differently. The last of the elements is that there be no gross negligence. I don't have a good idea of what gross negligence is in a mortgage context like this, but I don't know how it's not negligent to know that there's another mortgage in front of you or as part of this transaction. You're making a common sense argument. I noticed when you briefed you didn't cite any authority, any case law, as to what constitutes gross negligence, correct? I don't really see. I just see that concept going back 100 years, and negligence is, I guess, in the eye of the beholder. But how could it not be negligent on behalf of the plaintiff to not know of all the transactions or all the mortgages ahead of it? I mean, it's out of record. There's no issue about that. Well, there is a slight issue with the grantor-grantee aspect of that, which is the official record. It's not burden of proof, is it? It is the plaintiff's burden of proof. On conventional subrogation, this replaces the Conveyance Act. So all of these elements are their burden of proof. So if they have to prove that they're not grossly negligent, does that mean that they therefore, if they only prove that they're just negligent, then they have succeeded? Perhaps. The case law uses gross negligence. But is that something along the lines of willful and wanton? I can't prove either. There's no fact. Didn't you claim that this was de novo review because the facts weren't in contest? Well, I did, and I looked at it again. The case law from this district and others dealing with the mortgage all say it should be de novo. Now, that is troubling because we have this motion to reconsider, although Judge Hoffman himself never says that there's some distinction in the facts. In fact, his opinion says he was in error. He acknowledges that he made an error in finding the prejudice, correct? Because your client would have been in essentially the same position. Well, his opinion is that, it does use the word error, that he re-looks at the $400,000 countrywide. And in terms of, again, this is not part of the document. So is this the intention? In Paragraph 4, what we're looking at, this doesn't count. Judge Hoffman has to look at, which I invite you to, the second closing statement, although it's all part of the same transaction, and that's where the $150,000 is, is on the countrywide. Most of the countrywide goes to pay off the first and second mortgage. And again, the plaintiff's mortgage is not enough to fully cover both of those. They need countrywide. So gross negligence, well, you were asking about de novo review. My point is, if it's de novo review and the facts are not in context, then it would seem that we're supposed to establish, as a matter of law, whether or not what the record reflects is gross negligence, if at all any form of negligence. The way I try to look at it is, if this motion to reconsider were never part of the transaction, would your analysis or would the review be any different? I don't think it should be because we're only looking at mortgage documents and then one person's testimony about that transaction. And he says both of these mortgages, this was one transaction to Zarkin, that he was refinancing all the mortgages above him. So again, conventional segregation is to effectuate the real intention of the parties. He said his intent at the time was to refinance all previous debts. Yes. So that was his intent and that was the expressed intention. And that included my client. Right, but it also included plaintiffs or Bank United. Yes, but it didn't happen and it's not their fault, it's not my fault, but the conventional subrogation is somehow displacing the Conveyance Act, which works pretty well. And my point is, if this case is conventional subrogation, we don't need the Conveyance Act. So the purpose of conventional subrogation is to address situations like this, correct? And the policy reasons that are stated in Ames Capital, that if it were not for conventional subrogation, it would be much more difficult to provide relief to people like Zarkin, where they wouldn't be able to get a loan, correct? It does say that, but I don't know that if you think that through that it really is correct. I don't know how it would be more... The Supreme Court and this Court have said that that is correct. How is it easier to get lending when you have uncertainty about whose mortgage is first, second? How does that create more lending? I don't believe it possibly could. You're arguing uncertainty, and Justice Burkett has just pointed out to you that based upon the Supreme Court and this Court's decisions, there is no uncertainty. It's certain that subrogation would determine who was prior. The record in this case would... Or who was more secured. And I would tell you that the record in this case directly contradicts that. We have a judge who handles mortgages and chancery cases and is experienced, and on day one and day two has completely opposite conclusions. That's uncertainty, and it could have... That's error. I'm sorry? That's error. You made a mistake. And so how is someone on the outside looking at the public record going to... and who's thinking about lending under a given situation, how is that creating more lending or more opportunity for a distressed individual to buy themselves out? Well, you can't use the results to justify that analysis because there was no such conventional subrogation than you deprive all of the homeowners and people of the flexibility to refinance their mortgage. You're saying because it went wrong at the end and Zarkin didn't do what he represented, the whole concept should be out. But that's not what Judge Hoffman says. He doesn't look at the end. He looks at the second, the country-wide mortgage and says, maybe I misread that somehow because the money came from country-wide. That's the money that... But you don't understand that from... Your time is up. Thank you. Mr. Price. May it please the Court, Counsel. Good morning. My name is Adam Price, attorney for Plaintiff Appellee in this matter, Wilmington Savings. For the reasons stated in our brief and for the reasons I follow in argument here today, we respectfully request the judgment of the Circuit Court be affirmed. Counsel, you know there's specified elements of conventional subrogation or the home savings Supreme Court case, right? Yes, Your Honor. Can you tell us succinctly how those elements were met in this case? Of course, Your Honor. The main argument that I believe Beckerman and Nemov make in their brief and argument here today was that there was no express agreement between the originating lender of this particular mortgage, Bank United, and the Zarkins. But the language contained in the mortgage document itself, which is the agreement between those two parties, is squarely on all fours with Ames Capital case, Union Planters, as well as to a lesser extent the Union Bank case. I would note that Ames Capital, as noted previously, as well as Union Bank versus Thrall were both decided by this particular district. And why is the situation on all fours of those cases that you represent? Well, in Union Planters, they expressly quote the language in the mortgage at issue in that case, specifically quoting paragraphs 4 and paragraphs 9 from that mortgage, which are identical to paragraphs 4 and paragraph 9 of the Bank United mortgage here, noting specifically that the borrower shall promptly discharge any lien which has priority over the security instrument, and paragraph 9 permitting the lender to discharge prior mortgages. Ames Capital specifically noted that the words conventional subrogation do not need to be contained in the contract. It's the effect of the language that matters, and that was stated in Bierstadt. Union Planters follows that line of reasoning in saying there is no magic words, essentially. It's the effect of the language in the contract. And those provisions read together, the courts in those cases believed, that constituted an express agreement for purposes of conventional subrogation. Would it have made any difference if the mortgagor had originally intended not to pay off the Bechelin mortgage? Well, I don't think so, Your Honor, and here's the reason. The intent was to use the proceeds from the other loan, the countrywide loan, to pay off the Beckerman and Niemoff mortgage, and then the borrower apparently unilaterally decided not to do that, from what I can tell in the record on appeal. I think it's the agreement between Bank United at the time and the Zarkins that matter, and the agreement both expressly stated in the mortgage as well as in the settlement statement, which is contained in the record on appeal, don't state anything with respect to the Beckerman and Niemoff mortgage. It was that separate transaction, as Judge Hoffman noted, a separate but simultaneous transaction for which the Zarkins originally intended to pay off Beckerman and Niemoff, but then ended up using the money apparently for their construction business. Did the bank know about the Beckerman and Niemoff loan? What was that, Your Honor? Did the bank know about his client's mortgage? The record on appeal doesn't disclose that they did, Your Honor. With respect to the other elements of moving on to harm, it's apparent from the argument here today in the defendant's brief that the only sense in which they're allegedly harmed by this transaction and by the circuit court's judgment is that they're not receiving a windfall. As Your Honor has noted in questioning counsel, they're in exactly the same position if not a better position now than before these two transactions took place. The day before these refinancing transactions took place, Beckerman and Niemoff were behind the Harris and homecoming mortgages. Those mortgages are somewhere in the neighborhood of $1.2 million. The day after these refinancing transactions took place, they were behind my client's mortgage in the amount of $1.05 to $3 million. So there's really no harm in the sense that they're not in a worse position now than they were before the refinancing transactions took place. Did you allude that they were in a better position? It can be argued that they're in a better position because they're not behind so much. Now they're only behind my client, the Bank United mortgage, in the amount of $1.05 to $3 million, an amount which does not accrue interest over time, is not subject to additional advances, is not subject to attorney's fees or court costs as noted in the Ames and Union Plaintiff's cases. You're saying that in essence the amount of the private loan that they would be subject to is more limited than it would have been had they not refinanced. Well, under the Harrison, being behind the Harrison homecoming loans, they would be subject to the approval of interest. Right, but that is a current mortgage. Correct. Judge Hoffman found that the plaintiff only took a priority position to the amounts actually used for the refinancing, not additional interest, attorney's fees, court costs, advances such as taxes or insurance. And then the third element, was the funding actually used for the refinancing? The record discloses that it does. Of course, the settlement statement in the record on appeal discloses that of the amount of the Bank United loan, the entire amount was used to refinance the Harrison homecoming mortgages. I will say it is true that Zarkin was required to come to the table with additional funding from the countrywide loan to help discharge both those loans, but there's no dispute that the entire proceeds from the Bank United loan were used towards the refinancing. What do you make of your opponent's argument, his overarching argument? You know, on this intent issue, clearly, Zarkin was intending to pay off his client's mortgage. This was part and parcel of the whole transaction going into this deal. That didn't end up happening. Therefore, he was harmed, or they were harmed. I don't see how Zarkin's subjective intent disclosed in his evidence deposition has any effect upon the express language between Zarkin and Bank United at origination. In other words, the language of the mortgage was not changed. It still contained those paragraphs, foreign paragraphs, paragraph 9. Furthermore, it doesn't change the fact that... Are you arguing the statute of frauds? I wouldn't say I'm arguing the statute of frauds. I would say that I don't believe Zarkin's subjective intent with respect to how he was going to use the proceeds in the separate countrywide transaction has any effect on the express agreement between the Zarkins and Bank United at origination. He used the proceeds from that other loan, not from the Bank United loan. Finally, the final element of being gross negligence, I believe that Plaintiff did show, as the record on appeal disclosed, that it did not commit gross negligence. By the way, in the course of your research, did you unearth any cases that have defined gross negligence? I have not. There really isn't. I think Ames Capital addresses that fact, and certainly Union Plaintiffs does that. While Bierstadt says there can't be gross negligence, but nothing really develops what gross negligence would be. In all the cases, although this is McLaren using a little bit of logic, seemingly gross negligence would have to be more than mere negligence, correct? Yes, agreed. Also, I would note that there are situations in both Ames Capital and Union Plaintiffs which evidence what gross negligence is not. Those cases certainly stand for the proposition that failing to pay off an intervening lien itself is not gross negligence. The concept of negligence, a duty, a breach of duty, must raise the question as to what was Bank United's duty at origination to Beckerman & Nemo. There's certainly no evidence in the record on appeal that Bank United had any sort of duty to Beckerman & Nemo to discharge those liens. It's not evidenced in the mortgage agreement or any of the settlement statements which appear in the record on appeal. I also think those policy arguments are important. The ability for a borrower to refinance one but not necessarily all of the mortgages that encumber their house certainly opens up the door to put them in a better financial position. This is especially so knowing what happened in 2008 and 2009 with the mortgage crisis. So if they have a first mortgage and then interest rates drop, the doctrine of conventional subrogation allows them to refinance their first mortgage potentially into a mortgage with better terms. I think it's an important tool for borrowers to be able to do that. Otherwise, they would be required to obtain new financing to refinance all of the liens on the property, which they might not be financially able to do, especially if the property precipitously drops in value over the course of time, which appears to be the case here. I would like to touch on briefly also the standard of review with respect to this case. In his reply brief, counsel argues that we are seeking an abuse of discretion standard of review. And while I acknowledge that generally, motions to reconsider are reviewed for an abuse of discretion, I do say a case in my brief that you don't get a more favorable standard of review just because there is a motion to reconsider. In other words, I think the appropriate standard of review here, as argued in my brief, is a manifest way to the evidence standard. And I think that goes part and parcel with the fact that there's no transcript from the trial. Counsel stated earlier that Bank United or the plaintiff at the time didn't have a witness testify at trial. I wasn't at the trial. I'm not in a position to say if that's the case or not. I certainly don't think counsel is misrepresenting any facts to this court. However, the record on appeal doesn't reflect what happened at trial at all. The only record with respect to the trial are what physical exhibits were tendered at the trial. And that's all that we're looking at, correct? We're looking at a transcript of Zarkin and documents.  That's it. That's correct, Your Honor. And doesn't the case law make it pretty clear that when we are reviewing a case that involves documents and there's no questions of fact that the noble review should apply? Well, I don't believe there's no questions of fact here. Judge Hoffman, in his order reconsidering his prior decision, specifically found that the plaintiff wasn't negligent, let alone grossly negligent. There were considerations of fact surrounding that decision. With respect to some language about the express agreement, I would perhaps agree that Those are findings of fact based upon evidentiary fact. Right. But the record on appeal doesn't disclose what evidence, you know, if there's any other testimony beyond the documents and Zarkin's evidence deposition. And so I think with respect to the inadequacy of the record on appeal, even though that goes part and parcel with the standard of review, there was a trial here. This was not decided on summary judgment. And so I think there needs to be a sufficient record for this court to find that Judge Hoffman's decision was against the manifest way of the evidence. With that, I would respectfully request the judgment of the circuit court be affirmed, and I thank Your Honors. Thank you. Mr. Butler? I'd like to take up a couple of those points, and particularly the public policy about refinancing, which we talked about earlier. All one would have to do, instead of just using the standard uniform paragraph 4, is to say in the document expressly, this mortgage is intended to take out that mortgage over there. Done. Problem solved. And you still have the conveyance act. That's not what we have here. We have just standard paragraph 4 that we're going to use now across the board in conventional segregation. Again, it becomes the rule and not the exception. I believe Judge Hoffman, particularly in his first decision, but in his second decision, talks about what he reviewed and looked at. Assuming, arguendo, that your argument makes perfect sense, but in reality, the prior mortgages were not satisfied, released and discharged, what difference does it make thereafter if that's what's in the document, but that isn't what happened in reality? So if the mortgage, if... The document said this was going to be paid, these funds were going to be used to satisfy release and discharge prior mortgages, but they didn't, does that then mean that your argument seems to be, well, we've got a sine qua non, this is, I lose because it's in the document. Don't you think that the argument might be that it's not in the document, despite the fact that what actually happened happened, which was they were discharged? Doesn't that seem to be a salient fact, which is that what is intended actually takes place? I may not be following all of it, and it's certainly my fault, but what was intended here did not take place, is what I'm trying to... You're telling me that the intent was not to pay off the prior mortgages of roughly $1.2 million? The intent was to pay all the mortgages off, and that didn't happen. And I think if we wanted to use conventional subrogation appropriately, we would need, in terms of this express agreement, something that is specific to the transaction, which would not be difficult to add in. My recollection is that if you had appeared in the bankruptcy and claimed that Mr. Zarkum committed fraud because he made false representations and didn't do what he said he was going to do, that you might be entitled to having your debt or your judgment remain intact and not be discharged? Am I wrong in the possibility that you could have done something like that? I'm going to just punt. I don't know. I mean, that certainly fees well and not something that... Does it seem that, based upon what he said, that seems to be something less than forthright and ethical and moral? Well, there's a lot of coincidence here. I mean, it's $152,000 that he walks away with. It's $150,000 that my clients were owed in a month's worth of interest or so. So it's right there. And one would think that when all this was planned out, my client was supposed to be paid off. If you look at the dates here, it's only one month earlier that my client's $150,000 is. So I don't know, and it wasn't explored in Mr. Zarkum's debt, which is part of the record, that theory, what he says he was going to, and that's what the record is. But that bankruptcy fraud argument, maybe. But that perhaps supports my view that we should, if we're going to use conventional subrogation, have something a little more specific than a uniform clause and that actually there is some express statement in these. Because here, we actually have to look at the entire record, including these closing statements, to know what's going on. You can't just look at the mortgages in this case and know what's going on. You can't look at the plaintiff's mortgage. You can't look at the next mortgage. You have to put that transaction together and look at the mortgages. You have to look at the closing statements, and you have to hear from Mr. Zarkum. And when you put all that together, that's what I say. In this case, conventional subrogation is not what it was designed to do. Did your clients know that Zarkum was refinancing? No idea. Absolutely no idea. In fact, they continued to pay them for some period of time afterwards. Thank you. Court, thanks both parties for their arguments today. A written decision will be issued in due course. The Court stands in recess.